No. 25-2087

# In the United States Court of Appeals for the Eighth Circuit

IOWANS FOR ALTERNATIVES TO SMOKING & TOBACCO, *et al.*,

*Plaintiffs-Appellees*,

v.

MARY MOSIMAN, in her official capacity as
Director of the Iowa Department of Revenue,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Iowa
Case No. 4:24-cv-448
(The Honorable Stephanie M. Rose)

## CORRECTED BRIEF OF PLAINTIFFS-APPELLEES

Eric N. Heyer
James C. Fraser
Anna Stressenger
THOMPSON HINE LLP
1919 M Street, NW, Suite 700
Washington, DC 20036
Phone: 202.331.8800
Fax:  202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Anna.Stressenger@ThompsonHine.com

*Counsel for Plaintiffs-Appellees*

## PLAINTIFFS-APPELLEES' CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellees Iowans for Alternatives to Smoking & Tobacco, Inc., Wages and White Lion Investments, LLC d/b/a Triton Distribution, Smokin Hot LLC, and Taste the Vape LLC d/b/a Route 69 Vapor do not have any parent corporation and no publicly held corporation owns 10% or more of their stock or membership interests.

Plaintiff-Appellee Global Source Distribution, LLC's parent corporation is Halfhill & Company, Inc., which owns 100% of the membership interests of Global Source Distribution, LLC. No publicly held corporation owns 10% or more of the stock of either Global Source Distribution, LLC or Halfhill & Company, Inc.

Plaintiff-Appellee Central Iowa Vapors of WDM, LLC's parent corporation is Central Iowa Electronic Cigarettes, Inc., which owns 100% of the membership interests of Central Iowa Vapors of WDM, LLC. No publicly held corporation owns 10% or more of the stock of either Central Iowa Vapors of WDM, LLC or Central Iowa Electronic Cigarettes, Inc.


_____/s/ Eric N. Heyer_____
Eric N. Heyer (Bar No. 25-0280)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUES ..........................................................3

STATEMENT OF THE CASE..............................................................4

    I.     ENDS products are a less harmful alternative to traditional cigarettes that the FDA regulates under the FDCA..............................4

    II.    The FDA has rejected Big Tobacco's attempts to change its enforcement discretion policy for ENDS lacking marketing authorization. ........................................................................8

    III.   The Iowa Legislature adopted Big Tobacco's proposed enforcement policy for unauthorized ENDS.......................................10

    IV.   H.F. 2677 threatens the continued existence of the retailer Appellees' businesses and prevents the consumer Appellees from using the ENDS products they prefer..................................................12

    V.    Procedural history.......................................................................13

SUMMARY OF THE ARGUMENT ....................................................14

STANDARD OF REVIEW ..................................................................16

ARGUMENT ......................................................................................18

    I.     The District Court Correctly Held that Appellees Have Article III Standing................................................................................18

    II.    The District Court Correctly Held that Appellees Have a Strong Likelihood of Success on the Merits Because House File 2677 is Impliedly Preempted by the FDCA.....................................24

        A.    The text and structure of the FDCA, including the Act's tobacco provisions, reflect that Congress intended section 337(a) to apply to tobacco products..........................................29

        B.    When it enacted the TCA, Congress understood from *Buckman* and its progeny that section 337(a) could impliedly preempt state law duties if the "existence of" the TCA was a "critical element" of those duties. ..........................33

C.    In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a). ............................................................34

    1.    The plain language of section 387p suggests that Congress did not intend it to limit the applicability of section 337(a). ...........................................35

    2.    The TCA's legislative history suggests Congress did not intend section 387p's preservation and saving clauses to nullify section 337(a) with respect to tobacco products. ...........................................36

    3.    Appellant's interpretation of section 387p would allow a State to deputize itself to enforce any of the FDCA's tobacco provisions and render the express preemption provision of section 387p(a)(2)(A) a nullity. ...........................................38

D.    The State's interpretation of the FDCA would tolerate state law requirements that actually conflict with federal requirements, violating the Supreme Court's command that preservation and savings clauses do not bar the ordinary working of conflict preemption principles. ................41

E.    Even examining section 387p in isolation, H.F. 2677 would be expressly preempted because it imposes premarket authorization requirements that are "different from" or "in addition to" those set forth in 21 U.S.C. §§ 387j and 387e(i). ....................................................47

III.    The District Court Adequately Addressed the Non-Merits Factors for a Preliminary Injunction. .................................49

IV.    The District Court Acted Well Within Its Discretion in Waiving the Bond Requirement. ........................................................52

CONCLUSION ........................................................................54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABF Freight Sys. v. Int'l Bhd. of Teamsters*,
 645 F.3d 954 (8th Cir. 2011) ...................................................3, 18, 19

*Abramski v. United States*,
 573 U.S. 169 (2014)..................................................................29

*Akerman v. Nw. Mut. Life Ins. Co.*,
 No. 24-3076, 2025 U.S. App. LEXIS 12093
 (7th Cir. May 19, 2025) .................................................................51

*American Telephone & Telegraph Co. v. Central Office Telephone,
 Inc.*, 524 U.S. 214 (1998)..................................................................43

*Anderson v. John Morrell & Co.*,
 830 F.2d 872 (8th Cir. 1987) ...............................................................23

*Andrews v. Conrail*,
 831 F.2d 678 (7th Cir. 1987) ...............................................................25

*Animal Legal Defense Fund v. Reynolds*,
 89 F.4th 1071 (8th Cir. 2024) .......................................................3, 20

*Arizona v. United States*,
 567 U.S. 387 (2012).............................................................42, 45, 47

*Association of Data Processing Service Organizations Inc. v. Camp*,
 397 U.S. 150 (1970)..................................................................19

*Aurora Loan Servs. v. Craddieth*,
 442 F.3d 1018 (7th Cir. 2006) .......................................................3, 20

*Bell v. Am. Traffic Sols. Inc.*,
 371 F. App'x 488 (5th Cir. 2010).......................................................21

*Ben Oehrliens & Sons & Daughter, Inc. v. Hennepin County*,
 115 F.3d 1372 (8th Cir. 1997) ...............................................................23

*Bryant v. Medtronic, Inc. (In re: Medtronic, Inc. Sprint Fidelis Leads
 Prods. Liab. Litig.)*,

623 F.3d 1200 (8th Cir. 2010) ......................................................8, 27

*Buckman Co. v. Plaintiffs' Legal Committee*,
  531 U.S. 341 (2001)....................................... 3, 8, 15, 25, 26, 33, 34

*Cannon v. Univ. of Chicago*,
  441 U.S. 677 (1979)................................................................33

*Carlsen v. GameStop, Inc.*,
  833 F.3d 903 (8th Cir. 2016) ...................................................19, 22

*Caterpillar Inc. v. Williams*,
  482 U.S. 386 (1987)................................................................23

*Christian County Clerk v. Mortgage Elec. Registration Sys.*,
  515 Fed. Appx. 451 (6th Cir. 2013)................................................18

*Circle R. v. Smithco Mfg.*,
  919 F. Supp. 1272 (N.D. Iowa 1996) ..............................................51

*Citizen Ctr. v. Gessler*,
  770 F.3d 900 (10th Cir. 2024) ....................................................21

*Re: Complaint Filed by R.J. Reynolds Tobacco Co. and R.J. Reynolds
  Vapor Co. Concerning Certain Disposable Vaporizer Devices &
  Components & Packaging Thereof*,
  Inv. No. 337-TA-1381, 2023 WL 11932250
  (U.S. Intern. Trade Comm'n Dec. 15, 2023) ...................................9, 10

*Council on American-Islamic Relations-Minn. v. Atlas Aegis, LLC*,
  497 F. Supp. 371 (D. Minn. 2020)..............................................53, 54

*Craig v. Simon*,
  980 F.3d 614 (8th Cir. 2020) .....................................................51

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)................................................................24

*In re DeLorean Motor Co.*,
  755 F.2d 1223 (6th Cir. 1985) ....................................................52

*Depuy, Inc. v. Zimmer Holdings, Inc.*,
  384 F. Supp. 2d 1237 (N.D. Ill. 2005)............................................19

*Doctor John's, Inc. v. City of Sioux City.*,
305 F. Supp. 2d 1022 (N.D. Iowa 2004) ........................................................3, 53

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) .............................................................21

*Farina v. Nokia, Inc.*,
625 F.3d 97 (3d Cir. 2010) ...............................................................44

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024) .............................................................................19

*Flight Options, LLC v. Int'l Bhd. Of Teamsters, Local 1108*,
863 F.3d 529 (6th Cir. 2017) ...........................................................3, 51

*Freightliner Corp. v. Myrick*,
514 U.S. 280 (1995) .............................................................................25

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) ...................................... 3, 15, 34, 42, 43, 45, 47

*Grand River Enters. Six Nations v. Knudsen*,
No. 23-35494, 2024 WL 2992503 (9th Cir. Jun. 14, 2024) .............28

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) .............................................................................42

*Heartland Acad. Cmty. Church v. Waddle*,
335 F.3d 684 (8th Cir. 2003) ...........................................................17

*Heckler v. Chaney*,
470 U.S. 821 (1985) .........................................................................7, 25

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .........................................................................25, 42

*Home Instead, Inc. v. Florence*,
721 F.3d 494 (8th Cir. 2013) ...........................................................52

*Initiative & Referendum Inst. v. Walker*,
450 F.3d 1082 (10th Cir. 2006) (en banc) .......................................21

*Loreto v. Proctor & Gamble Co.*,
  515 Fed. Appx. 576 (6th Cir. 2013)....................................................27

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)...........................................................18, 19

*Marcin Lumber & Cedar Co. v. PPG Indus.*,
  401 F.3d 901 (8th Cir. 2005) ..........................................................42

*Miles v. Apex Marine Corp.*,
  498 U.S. 19 (1990)....................................................................33

*Motor Coach Employees v. Lockridge*,
  403 U.S. 274, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971) ....................................46

*Nathan Kimmel v. DowElanco*,
  275 F.3d 1199 (9th Cir. 2002) ........................................................33

*Nexus Pharms., Inc. v. Central Admixture Pharm. Serv., Inc.*,
  48 F.4th 1040 (9th Cir. 2022) .................................................8, 27, 44

*Nken v. Holder*,
  556 U.S. 418 (2009)...................................................................50

*Novo Nordisk Inc. v. Live Well Drugstore, LLC*,
  No. 23-cv-808, 2025 U.S. Dist. LEXIS 17792
  (M.D. Fla. Jan. 30, 2025)..............................................................27

*Olin Water Servs. v. Midland Research Labs., Inc.*,
  774 F.2d 303 (8th Cir. 1985) .........................................................17

*Parker v. District of Columbia*,
  478 F.3d 370 (D.C. Cir. 2007),
  *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............18

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*,
  558 F.2d 861 (8th Cir. 1977) .........................................................17

*Provell v. 1703408 Ontario Inc. Ltd.*,
  No. 3:10-cv-13, 2010 U.S. Dist. LEXIS 36290
  (D.N.D. March 15, 2010)..............................................................53

*R.J. Reynolds Tobacco Co. v. City of Edina*,
   60 F.4th 1170 (8th Cir. 2023) ...............................................28

*Regan v. Sioux Honey Ass'n Coop.*,
   921 F. Supp. 2d 938 (E.D. Wis. 2013) ..............................27

*Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engr's*,
   826 F.3d 1030 (8th Cir. 2016) ...............................................52

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ...............................................................23

*Scanlon v. Medtronic Sofamor Danek USA, Inc.*,
   61 F. Supp. 3d 403 (D. Del. 2014) .....................................36

*Shrink Mo. Gov't PAC v. Adams*,
   151 F.3d 763 (8th Cir. 1998) ...............................................51

*Sleep No. Corp. v. Young*,
   33 F.4th 1012 (8th Cir. 2022) ...............................................17

*South Carolina v. Catawba Indian Tribe*,
   476 U.S. 498 (1986)...............................................................37

*Sprietsma v. Mercury Marine*,
   537 U.S. 51 (2002)...............................................................44

*Stockslager v. Carroll Elec. Coop. Corp.*,
   528 F.2d 949 (8th Cir. 1976) ...............................................52

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)...............................................................23

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994)...............................................................29

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001)...............................................................41

*United States v. Belmont*,
   831 F.3d 1098 (8th Cir. 2016) ...............................................40

*United States v. Iowa,*
126 F.4th 1334 (8th Cir. 2025) ..........................................................45

*United States v. Kramer,*
827 F.2d 1174 (8th Cir. 1987) ...........................................................17

*United States v. Locke,*
529 U.S. 89 (2000)..............................................................................47

*United States v. Menasche,*
348 U.S. 528 (1955)............................................................................37

*United States v. R.L.C.,*
915 F.2d 320 (8th Cir. 1990) .............................................................29

*United States v. Texas,*
599 U.S. 670 (2023)............................................................................49

*Vapor Tech. Ass'n v. FDA,*
977 F.3d 496 (6th Cir. 2020) ...............................................................6

*Vapor Technology Association v. Taylor,*
No. 3:24-cv-74-KKC, 2024 U.S. Dist. LEXIS 16472
(E.D. Ky. Jan. 30, 2025) ....................................................................20

*Vapor Technology Association v. Wooten,*
No. 4:25-cv-00076-M-RJ, 2025 U.S. Dist. LEXIS 123020
(E.D.N.C. June 27, 2025)..............................................................20, 21

*Westerfeld v. Indep. Processing, LLC,*
621 F.3d 819 (8th Cir. 2010) .............................................................41

*Winter v. NRDC, Inc.,*
555 U.S. 7 (2008)................................................................................16

*Wyeth v. Levine,*
555 U.S. 555 (2009)............................................................................29

## Statutes

U.S. Const., art. VI, cl. 2 ..................................................................24

Consolidated Appropriations Act, 2022,
    Pub. L. 117-103, 136 Stat. 49 (2022) ...................................5

Family Smoking Prevention and Tobacco Control Act,
    123 Stat. 1776 (2009)..........................................5, 35, 43

Food, Drug, and Cosmetic Act,
    Pub. L. No. 75-717, 52 Stat. 1040 (1938) .....................4, 30

Nutrition Labeling and Education Act,
    Pub. L. 101-535, 104 Stat. 2353 (1990) ..........................31

21 U.S.C. § 331 .......................................................................1

21 U.S.C. § 331 ......................... 4, 23, 25, 30, 38, 39, 48

21 U.S.C. § 332 .............................................30, 38, 39

21 U.S.C. § 333 .............................................30, 38, 39

21 U.S.C. § 334 .............................................30, 38, 39

21 U.S.C. § 337 ......................................1, 3, 7, 24, 38

21 U.S.C. § 346a ...............................................31, 35

21 U.S.C. § 350e ......................................................31

21 U.S.C. § 350g ......................................................31

21 U.S.C. § 351 .........................................................4

21 U.S.C. § 360 ........................................................25

21 U.S.C. § 360k ......................................................31

21 U.S.C. § 364j ...............................................31, 32

21 U.S.C. § 379aa ...................................................32

21 U.S.C. § 379aa-1 ................................................32

21 U.S.C. § 379s .................................................................32

21 U.S.C. § 387a .................................................................5

21 U.S.C. § 387a-1 .................................................................35

21 U.S.C. § 387b .................................................................1, 6, 30, 39, 40

21 U.S.C. § 387c .................................................................38

21 U.S.C. § 387e .................................................................38

21 U.S.C. § 387j .................................................................1, 6, 24, 39

21 U.S.C. § 387p .................................................................24, 32, 35, 40

21 U.S.C. § 387s .................................................................39

21 U.S.C. § 844 .................................................................23

**Regulations**

21 C.F.R. § 210 .................................................................4

21 C.F.R. § 211 .................................................................4

21 C.F.R. § 820 .................................................................4

21 C.F.R. § 1308.11 .................................................................23

**Rules**

Fed. R. Civ. P. 65 .................................................................52

**<u>Other Authorities</u>**

FDA, *Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28,974 (May 10, 2016) .................................................................. 5

FDA, *Supplemental Applications Proposing Labeling Changes for Approved Drugs, Biologics, and Medical Devices*, 73 Fed. Reg. 49603 (Aug. 22, 2008) .................................................................. 42

Food and Drug Administration Regulatory Procedures Manual, July 2024, *available at* https://www.fda.gov/media/71878/download .................................................................. 46

H.F. 2677 .................................................................. 11, 46, 48

H.R. 1261 (Mar. 3, 2009) .................................................................. 37

H.R. Rep. No. 111-58 (Mar. 2009) .................................................................. 37

## INTRODUCTION

Plaintiffs-Appellees are sellers and consumers of electronic nicotine delivery system ("ENDS") products and an Iowa trade association whose members sell ENDS products. ENDS, also known as electronic cigarettes, are alternatives to traditional cigarettes that are less harmful because they do not contain tobacco, involve combustion, or generate smoke, tar, or ash.

ENDS products are subject to federal regulation by the Food and Drug Administration ("FDA") under the Tobacco Control Act ("TCA"), which is codified as subchapter IX of the Food, Drug, and Cosmetic Act ("FDCA"). Another provision found in subchapter III of the FDCA provides that "all proceedings . . . for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States." 21 U.S.C. § 337(a). Among the FDCA's requirements for ENDS is that they are subject to premarket review through the FDA's premarket tobacco product application ("PMTA") process under 21 U.S.C. § 387j. ENDS products sold in interstate commerce without FDA premarket authorization are considered "adulterated" and their sale is prohibited. 21 U.S.C. §§ 387b(6)(A); 331. However, as explained herein, in weighing Congress's competing objectives in enacting the TCA, FDA exercises enforcement discretion with respect to certain ENDS products and has not required their removal from the market despite their lack of an FDA marketing order.

In 2024, the Iowa legislature enacted House File 2677 ("H.F. 2677"). H.F. 2677 directs the Iowa Department of Revenue ("IDOR") to implement a directory of ENDS that may be lawfully sold in the state. H.F. 2677 directly cross-references and incorporates 21 U.S.C. § 387j, the premarket review provision of the FDCA for tobacco products. For a particular ENDS product to be eligible for listing on the directory, a manufacturer must be in either partial or full compliance with the FDCA's premarket authorization requirements for that product. Manufacturers and retailers that sell ENDS products not included in the IDOR directory are subject to civil penalties, seizure of unlisted products as "contraband," and adverse impacts on their licenses to sell ENDS.

Because the business Appellees sell ENDS products that lack FDA marketing authorization but as to which the FDA is exercising enforcement discretion, and Appellees would suffer irreparable harm, including several retailers shuttering their businesses, if the directory-related restrictions were enforced, the district court entered a preliminary injunction barring enforcement of H.F. 2677's directory-related provisions as impliedly preempted under 21 U.S.C. § 337(a). As explained herein, the district court's decision was a proper exercise of the court's discretion and should be affirmed.

# <u>STATEMENT OF THE ISSUES</u>

I. Whether the district court correctly found that Appellees have a strong likelihood of success on the merits of their claim because House File 2677 conflicts with, and is preempted by, the Food, Drug, and Cosmetic Act.

   1. 21 U.S.C. § 337(a).
   2. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000).
   3. *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).

II. Whether the district court correctly found that Appellees have Article III standing.

   1. *ABF Freight Sys. v. Int'l Bhd. of Teamsters*, 645 F.3d 954 (8th Cir. 2011).
   2. *Aurora Loan Servs. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006).
   3. *Animal Legal Defense Fund v. Reynolds*, 89 F.4th 1071 (8th Cir. 2024).

III. Whether the district court adequately addressed the non-merits factors when it granted Appellees' request for preliminary injunction and waived the bond requirement.

   1. *Flight Options, LLC v. Int'l Bhd. Of Teamsters, Local 1108*, 863 F.3d 529, 544 (6th Cir. 2017).
   2. *Doctor John's, Inc. v. City of Sioux City.*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004).

## STATEMENT OF THE CASE

**I.   ENDS Products Are a Less Harmful Alternative to Traditional Cigarettes that the FDA Regulates Under the FDCA.**

Electronic nicotine delivery system products heat a solution containing nicotine into an aerosol that the user inhales. App. 17 ¶ 50; R. Doc. 27 p. 13. Unlike traditional cigarettes, ENDS do not contain any tobacco leaf, do not rely on combustion, and do not generate smoke. *Id*. The FDA has recognized that ENDS are likely to have fewer and lower concentrations of harmful constituents than traditional cigarettes, with less attendant risk of tobacco-related disease, and that many adults have successfully used ENDS to quit smoking. App. 17 ¶ 51; R. Doc. 27 p. 13.

Congress enacted the FDCA in 1938 "to prohibit the movement in interstate commerce of adulterated and misbranded food, drugs, [medical] devices, and cosmetics." Pub. L. No. 75-717, 52 Stat. 1040 (1938).[1] In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act, amending the FDCA to prohibit the movement in interstate commerce of certain adulterated and misbranded tobacco products, including traditional (combustible) cigarettes. *See* 21 U.S.C. § 331 (prohibiting the "introduction into interstate commerce of any food, drug, device,

_____

[1] The FDCA defines the terms "adulterated" and "misbranded." 21 U.S.C. § 351(a)(2)(B) & (h), 21 C.F.R. pts. 210, 211, and 820.

*tobacco product*, or cosmetic that is adulterated or misbranded") (emphasis added); 21 U.S.C. § 387a(b) (limiting the FDA's authority over tobacco products to, *inter alia*, cigarettes). One of Congress's stated purposes in enacting the TCA was to reduce serious tobacco-related disease and death—primarily caused by combustible cigarettes. *See* TCA, § 3(9), 123 Stat. 1776, 1782 (2009).[2] Another of Congress's stated purposes was to "provide new and flexible enforcement authority to ensure that there is effective oversight of the tobacco industry's efforts to develop, introduce, and promote less harmful tobacco products." TCA, § 3(4), 123 Stat. at 1782.

In 2016, the FDA adopted a regulation that extended the agency's authority over tobacco products to ENDS products containing tobacco-derived nicotine. *See* 81 Fed. Reg. 28,974 (May 10, 2016). In April 2022, Congress further extended this authority to ENDS products containing non-tobacco-derived nicotine.[3]

When ENDS containing tobacco-derived nicotine became subject to the FDCA in August 2016, they automatically became "adulterated" tobacco products

---

[2] Among its findings supporting enactment of the TCA, Congress found that "approximately 8,600,000 Americans have chronic illnesses related to smoking." TCA, § 2(13), 123 Stat. at 1777. Those chronic illnesses include "cancer, heart disease, and other serious adverse health effects." TCA, § 2(2), 123 Stat. at 1777.

[3] *See* Consolidated Appropriations Act, 2022, Pub. L. 117-103, 136 Stat. 49, Division P, Title I, Subtitle B, §111(a) (amending the definition of "tobacco product" in 21 U.S.C. § 321(rr)(1) to include products containing nicotine "from any source").

until the manufacturer obtained FDA marketing authorization through the premarket tobacco application process. 21 U.S.C. §§ 387b(6)(A), 387j(a)(2)(A). The same was true for ENDS containing non-tobacco-derived nicotine in April 2022.

However, there were already many ENDS with tobacco-derived nicotine on the market by August 2016; likewise, there were a very large number of ENDS with non-tobacco-derived nicotine on the market by April 2022. App 18 ¶ 55; R. Doc. 27 p. 14. The FDA recognized that immediately forcing all unauthorized ENDS off the market while manufacturers go through the PMTA process could result in many ENDS users reverting to traditional cigarettes. *See Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 499 (6th Cir. 2020) (noting the FDA's view that removing all unauthorized ENDS from the market too quickly "creates a genuine risk of migration from potentially less harmful [e-cigarette] products back to combustible tobacco products," and that this would be a "public health outcome that should be avoided if at all possible"). Such a result would have been contrary to Congress's directive to reduce the incidents of disease and death resulting from the use of traditional tobacco products and to provide flexible enforcement authority to effectively oversee the introduction and promotion of less harmful alternatives. Therefore, as FDA itself stated in October 2023, "[t]hrough enforcement [discretion] policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers

completely transition from or significantly reduce smoking combustible cigarettes."
App. 19 ¶ 57; R. Doc. 27 p. 15.

Since September 2021, the FDA's policy with respect to unauthorized ENDS has been to exercise enforcement discretion on a "case-by-case" basis, citing its authority to do so under *Heckler v. Chaney*, 470 U.S. 821 (1985). App. 20 ¶ 58(g); R. Doc. 27 p. 16; App. 97; R. Doc. 27-6 p. 9. In exercising its enforcement discretion, the FDA says it "is continuously evaluating new information and adjusting its enforcement priorities in light of the best available data," and that it "will take appropriate action regarding [ENDS] that are marketed without premarket authorization as warranted based on changed circumstances, new information, or to better address minors' use of those products." App. 20 ¶ 58(g); R. Doc. 27 p. 16; App. 91; R. Doc. 27-6 p. 3.

Since 1938, the FDCA has always included a provision specifying that *only* the Federal Government can enforce the Act. *See* 21 U.S.C. § 337(a) (stating that "all such proceedings for the enforcement, or to restrain violations, of this [Act] shall be by and in the name of the United States"). Because the FDCA gives the Federal Government the exclusive authority to enforce the Act, the Supreme Court and other federal courts have rejected attempts by other parties to challenge an FDA decision to *not* enforce provisions of the Act. *See, e.g.*, *Heckler*, 470 U.S. at 835 (stating that the FDCA's enforcement provisions "commit complete discretion to [the FDA] to

decide how and when they should be exercised"). And the Supreme Court and other courts, including this Court, have held that 21 U.S.C. § 337(a) impliedly preempts any claim that seeks to directly or indirectly enforce the Act. *See, e.g.*, *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001); *Bryant v. Medtronic, Inc. (In re: Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.)*, 623 F.3d 1200 (8th Cir. 2010) (dismissing claims that were "simply an attempt by private parties to enforce the [FDCA], claims foreclosed by § 337(a) as construed in *Buckman*"); *Nexus Pharms., Inc. v. Central Admixture Pharm. Serv., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022) ("The statutory prohibition on private enforcement gives the FDA discretion to temper enforcement or not to enforce in circumstances it deems appropriate. If state law facilitates enforcement beyond what the FDA has deemed appropriate, then state law claims may indeed 'stand as an obstacle' to FDA's enforcement discretion.").

## II. The FDA Has Rejected Big Tobacco's Attempts to Change its Enforcement Discretion Policy for ENDS Lacking Marketing Authorization.

Evidently unsatisfied with how the FDA has exercised its enforcement authority over ENDS—which compete with their traditional cigarette products— "Big Tobacco" companies like R.J. Reynolds (maker of Camel and Lucky Strike brand cigarettes) and Altria (maker of Marlboro and Virginia Slims brand cigarettes) have encouraged the FDA to deviate from its case-by-case discretionary enforcement

policy. App. 16 ¶ 47; R. Doc. 27 p. 12. R.J. Reynolds filed a citizen petition with the FDA in February 2023 requesting that the agency "adopt a new enforcement" policy because the FDA "was not [doing] enough" to prevent underage use of unauthorized ENDS. App. 21 ¶ 59; App. 141-42; R. Doc. 27-7 pp. 2-3. The FDA denied Reynolds' citizen petition in November 2023. App. 22 ¶ 63; R. Doc. 27 p. 18. In so doing, the FDA told Reynolds: "[W]e do not agree that FDA has taken insufficient compliance and enforcement action against illegally marketed ENDS products . . . To the contrary, we believe that FDA's comprehensive approach to this matter demonstrates the Agency's robust commitment to implementing and enforcing the law . . . and preventing their access to and promotion of use by youth." App. 157; R. Doc. 27-9 p. 4. The FDA also stated that it "is continuously evaluating new information and, in making enforcement decisions, taking into account data on youth use and other risk factors." App. 161; R. Doc. 27-9 p. 8.

While its citizen petition was pending, Reynolds also filed a complaint at the United States International Trade Commission ("ITC") seeking to, *inter alia*, bar the importation of many of the same products that Reynolds asked the FDA to target via its citizen petition.[4] App. 22 ¶ 65.

---

[4] *See Re: Complaint Filed by R.J. Reynolds Tobacco Co. and R.J. Reynolds Vapor Co. Concerning Certain Disposable Vaporizer Devices & Components & Packaging Thereof*, Inv. No. 337-TA-1381, 2023 WL 11932250, at *1 (U.S. Intern. Trade Comm'n Dec. 15, 2023).

In response, the FDA sent a letter to the ITC urging it to reject Reynolds' attempt to use the ITC to enforce the FDCA. App. 22-23 ¶ 66; R. Doc. 27 pp. 18-19; App. 48-54; R. Doc. 27-2 pp. 1-6. Citing 21 U.S.C. § 337(a), the FDA noted that Congress wants "decisions about the regulatory or compliance status of tobacco products and what products should be prioritized for enforcement [to] reflect the views of the agency charged with administering the FDCA." App. 51; R. Doc. 27-2 p. 4. The FDA also noted that 21 U.S.C. § 337(a) reflects congressional intent to have "uniform administration of the FDCA." *Id.*

Based in part on the FDA's letter, the ITC dismissed Reynolds' claim seeking to bar the importation of unauthorized ENDS. *See* Inv. No. 337-TA-1381, 2023 WL 11932250, at *1 (stating "the Commission agrees with FDA"); App. 23 ¶ 67. The ITC reasoned that "it would usurp the FDA's authority to enforce the FDCA and impermissibly grant a private right of action to enforce the FDCA if the Commission were to institute an investigation based on the Reynolds complaint." *Id.*; 2023 WL 11932250, at *2.

## III. The Iowa Legislature Adopted Big Tobacco's Proposed Enforcement Policy for Unauthorized ENDS.

On May 17, 2024, Iowa Governor Kim Reynolds signed H.F. 2677 into law. App. 38; R. Doc. 27-1 p. 2. H.F. 2677 directs the Iowa Department of Revenue to do, in effect, what Reynolds asked the FDA to do via its March 2023 citizen petition and what Reynolds asked the ITC to do via its October 2023 complaint—*i.e.*, take

enforcement action against persons selling ENDS that have not been authorized by the FDA unless the product was on the market by August 8, 2016, and the product has a pending PMTA that was filed by September 9, 2020.

H.F. 2677 requires IDOR to establish a directory of ENDS products. H.F. 2677 § 4-1. For an ENDS product to qualify for the directory, the product's manufacturer must certify that the product either (1) has received "a marketing authorization or similar order for the vapor product from the United States food and drug administration pursuant to 21 U.S.C. § 387j"; or (2) "was marketed in the United States by August 2016, the manufacturer submitted a PMTA for the product by September 2020, "and the application remains under review by the United States food and drug administration or a final decision on the application has not otherwise taken effect." H.F. 2677 § 4-1.[5]

Persons are prohibited from selling or offering for sale any ENDS products not listed in the directory starting on the date the directory is published. H.F. 2677 §§ 5-1, 5-2. Businesses that sell ENDS products not listed in the directory are subject to monetary penalties, suspension and revocation of their licenses, misdemeanor charges, and actions brought under Iowa's consumer fraud statute. H.F. 2677 §§ 6-1 – 6-5. Given the potential for such penalties, the State agreed to defer

---

[5] Copies of documentation issued by the FDA must be included with the manufacturer's certification. H.F. 2677 § 4-3.

implementation of H.F. 2677 pending the outcome of the motion for preliminary injunction and any request for relief pending appeal. App. 179; R. Doc. 32 ¶ 2.

## IV. H.F. 2677 Threatens the Continued Existence of the Retailer Appellees' Businesses and Prevents the Consumer Appellees From Using the ENDS Products They Prefer.

Appellees include a trade association of distributors and retailers of ENDS, retailers of ENDS, and individual consumers of ENDS. App 8-11 ¶¶ 12-19; R. Doc. 27 pp. 4-7. If the business Appellees continue to sell ENDS products not listed in the new directory, they will be subject to the above-mentioned penalties if the directory contemplated by H.F. 2677 is published and enforced. Enforcement of H.F. 2677 also means that the consumer Appellees, Martina Pagano and James Cole, will not have access to the ENDS products upon which they rely to keep from reverting to more dangerous traditional cigarettes. App. 28 ¶ 90; R. Doc. 27 p. 24. And if the retailer Appellees remove products not listed on the directory from their shelves, they will go out of business. App. 26-33 ¶¶ 83-88, 96-101, 108-113; R. Doc. 27 pp. 22-27.

Indeed, given the substantial monetary penalties imposed for selling ENDS products not listed on the directory, should the district court's order be vacated, Appellees Smokin Hot, LLC, Central Iowa Vapors WDM, LLC, and Taste the Vape LLC, as well as other Iowa specialty vapor product retailers, will be forced to close their doors. Appellant's enforcement of H.F. 2677 will also cause Plaintiffs Cole and

Pagano to suffer harm by denying them the ability to use their preferred ENDS products to help keep them off combustible cigarettes, thereby increasing the risk that they revert back to smoking combustible cigarettes. App. 324 ¶ 5; R. Doc. 32-14 p. 2.; App. 327 ¶ 5; R. Doc. 32-15 p. 2.

In granting Appellees' request for preliminary injunction, the district court held that Appellees "have demonstrated concrete injuries that readily satisfy the injury-in-fact requirement." Appellant Add. p. 13; R. Doc. 49 p. 13. Indeed, the court found that such economic harm, "including lost sales, customers, and goodwill," and "loss of access to products [consumer Appellees] rely upon to avoid combustible cigarettes," "present direct health risks" and "represent paradigmatic examples of concrete harm sufficient to support standing." Appellant Add. pp. 13-14; R. Doc. 49 pp. 13-14. Finally, the district court held that "[t]hese injuries are not speculative, but flow directly from House File 2677's enforcement." Appellant Add. p. 14; R. Doc. 49 p. 14.

## V.    Procedural History.

The IDOR announced that it would publish the directory on January 2, 2025 and that it would begin enforcement of H.F. 2677 on February 3, 2025. App. 25; R. Doc. 27 ¶ 73. On December 17, 2024, Appellees filed a complaint in the district court seeking a declaratory judgment and preliminary and permanent injunctions against H.F. 2677's enforcement. R. Doc. 1. On the same day, Appellees filed a

motion for a preliminary injunction. R. Doc. 2. On February 19, 2025, Appellees filed an amended complaint, App. 5; R. Doc. 27, and a renewed motion for preliminary injunction, App. 178; R. Doc. 32. The district court held a motions hearing on April 3, 2025. R. Doc. 51. On May 2, 2025, the district court granted Appellees' motion for preliminary injunction. Appellant's Add. 1-32; R. Doc. 60. Appellants filed their notice of appeal on June 2, 2025.

For the reasons detailed below, the district court properly exercised its discretion in granting the preliminary injunction.

## SUMMARY OF THE ARGUMENT

The district court properly found that Appellees have Article III standing. Appellant misinterprets the "injury in fact" requirement; fails to recognize that Appellees, who are selling ENDS products under an exercise of enforcement discretion by FDA, are not analogous to drug smugglers and users; fails to acknowledge the full scope of Appellees' threatened injuries; and fails to consider that, in an H.F. 2677 enforcement action, Appellees could raise the same federal preemption argument as an affirmative defense.

The district court properly granted Appellees' motion for preliminary injunction because Appellees are likely to succeed on the merits of their implied preemption claim and will suffer irreparable harm absent an injunction. H.F. 2677 conflicts with, and is preempted by, the exclusive discretion Congress granted the

FDA in 21 U.S.C. § 337(a) to enforce (or not) the premarket authorization requirements established in 21 U.S.C. § 387j. The text, structure, purpose, and legislative history of the FDCA and TCA suggest that Congress intended section 337(a) to apply to the FDCA's tobacco authorities. And, contrary to Appellant's view, the TCA's preservation and savings clauses in 21 U.S.C. § 387p do not insulate from a finding of implied preemption a state restriction couched as a "sales" restriction that compels partial or full compliance with another provision of the TCA. H.F. 2677 compels such compliance because partial or full compliance with the premarket review requirements of 21 U.S.C. § 387j is a "critical element" of eligibility for listing on the directory. An interpretation to the contrary would tolerate state law requirements that actually conflict with federal requirements in violation of the Supreme Court's command that preservation and savings clauses do not "bar[] the ordinary working of conflict pre-emption principles." *Buckman*, 531 U.S. at 352 (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869 (2000)).

Appellees are also threatened with irreparable harm by enforcement of H.F. 2677. As the district court found, "[t]he manufacturer and retailer Plaintiffs face substantial economic harm—including lost sales, customers, and goodwill—if House File 2677 takes effect." Appellant's Add. P. 13. Enforcement of H.F. 2677 will cause lost revenues "not only from unauthorized ENDS products but also from numerous other product lines, including FDA-authorized ENDS products, FDA-

authorized nicotine pouch products, federally legal hemp products, and other non-ENDS merchandise." *Id*. at 14. These monetary losses, which put at risk the very existence of the retailer plaintiffs' businesses, will not be compensable because of sovereign immunity. Further, "[t]he individual consumer Plaintiffs face imminent loss of access to products they rely on to avoid combustible cigarettes, presenting direct health risks." *Id*. at 13-14. As the district court found, "[t]hese injuries are not speculative, but rather flow directly from House File 2677's enforcement." *Id*. at 14.

In contrast to the strength of Appellees' claim that H.F. 2677 is unconstitutional and the irreparable harm with which they are threatened, the district court properly found that Appellant had provided no evidence of damages that would result if an injunction issued. Thus, the "merged" factors of the balance of equities and the public interest also weigh strongly in favor of a preliminary injunction. Finally, the district court acted well within its discretion in waiving the bond requirement.

## <u>STANDARD OF REVIEW</u>

A district court should grant a motion for a preliminary injunction if the plaintiff establishes "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

This Court's "sole task in reviewing an order of the district court granting a preliminary injunction is to determine whether the court abused its discretion." *Olin Water Servs. v. Midland Research Labs., Inc.*, 774 F.2d 303, 307 (8th Cir. 1985). This Court reviews "the District Court's material factual findings for clear error, its legal conclusions de novo, and the court's equitable judgment—the ultimate decision to grant the injunction—for an abuse of discretion." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 689-90 (8th Cir. 2003). "Because the district court has 'considerable discretion' in 'determining whether or not a preliminary injunction should issue,' the scope of this court's review is 'very limited.'" *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 866 (8th Cir. 1977)).

"An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment." *United States v. Kramer*, 827 F.2d 1174, 1179 (8th Cir. 1987). Here, the district court properly weighed all relevant factors. Therefore, this Court should not disturb the district court's ruling.

## **ARGUMENT**

## I.    **The District Court Correctly Held that Appellees Have Article III Standing.**

Relying on the Supreme Court's description, in *Lujan v. Defenders of Wildlife*, of an "injury in fact" as an "invasion of a legally protected interest," 504 U.S. 555, 560 (1992), Appellant incorrectly asserts that Appellees lack Article III standing because Appellees' "injuries are neither legally protected nor cognizable." Appellant's Br. at 19. Appellant contends that because a new tobacco product— including an ENDS product, cannot be introduced or delivered for introduction into interstate commerce without an FDA marketing granted order under 21 C.F.R. § 1114.5, Appellees lack an injury in fact and thus Article III standing. Appellants' argument is incorrect for multiple reasons.

*First*, Appellant misreads *Lujan*. Explaining *Lujan*, this Court has stated: "When the Supreme Court used the phrase 'legally protected interest' as an element of injury-in-fact, it made clear it was referring only to a 'cognizable interest.'" *ABF Freight Sys. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 959 (8th Cir. 2011) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008)); *see also, e.g.*, *Christian County Clerk v. Mortgage Elec. Registration Sys.*, 515 Fed. Appx. 451, 454 (6th Cir. 2013) (stating that "[w]hen the *Lujan* Court used the phrase 'legally protected interest,'" it "did not mean to suggest a return to the old 'legal right' theory of standing rejected

in *Association of Data Processing Service Organizations Inc. v. Camp*, 397 U.S. 150, 153-54 (1970)).

In short, "a 'legally protected interest' requires only a 'judicially cognizable interest.'" *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quoting *ABF Freight Sys.*, 645 F.3d at 959). And the "judicially cognizable interest" requirement means only that for "a plaintiff to get in the federal courthouse door and obtain a judicial determination of what the governing law is, [he] cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 379 (2024). Here, Appellees have a personal stake in the dispute over whether H.F. 2677 is impliedly preempted.

While Appellant claims that Appellees "quibble with the precise terminology" of "legally protected" and "judicially cognizable" interest, the distinction is paramount. As Judge Posner, sitting by designation, colorfully explained in *Depuy, Inc. v. Zimmer Holdings, Inc.*, 384 F. Supp. 2d 1237, 1240 (N.D. Ill. 2005), "[p]robably all the [*Lujan*] Court meant was just that not any old injury can satisfy Article III—after all, there is a sense in which I am 'injured' when I become upset by reading about the damage caused that fine old vineyard in Burgandy by a band of marauding teetotalers, yet that injury would not be an injury to the kind of personal interest that I need to support an invocation of the federal judicial power created by Article III." Judge Posner again addressed this distinction from the Seventh Circuit

bench in *Aurora Loan Services, Inc. v. Craddieth*, 442 F.3d 1018 (7th Cir. 2006). "The point," he clarified, "is not that to establish standing a plaintiff must establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit." *Id*. at 1024. "It is that he must have a colorable *claim* to such right." *Id*. (emphasis in original).

This is the same reasoning that this Court applied in *Animal Legal Defense Fund v. Reynolds*, 89 F.4th 1071 (8th Cir. 2024). Appellant cites this case, yet it supports Appellees' point. In *Animal Legal Defense Fund*, the Iowa statute at issue prohibited trespassers from placing cameras that record images on trespassed property. *Id*. at 1075. This Court not only found that a plaintiff that claimed that it was a trespasser pled an adequate injury in fact as to one prong of the statute at issue, *id.*, at 1078, but as to the other prong of the statute, the Court held that the plaintiffs merely lacked standing because the plaintiffs neither pleaded that they place cameras on trespassed property nor that they desire to. *Id*. at 1079. As to the second prong, the plaintiffs were thus "injured" only in the sense that they were now barred from doing something they previously could do but never wanted to do. That is not the case here.[6]

---

[6] Notably, while Appellant cites *Vapor Technology Association v. Taylor*, No. 3:24-cv-74-KKC, 2024 U.S. Dist. LEXIS 16472 (E.D. Ky. Jan. 30, 2025) in support of its Article III standing argument, not only the district court here, but also the district court in *Vapor Technology Association v. Wooten*, No. 4:25-cv-00076-M-RJ, 2025

Indeed, the other circuit court cases that Appellant cites for her argument that Appellees must lack standing because "no one has the right to violate the law," Appellant's Br. pp. 18-19, likewise do not turn on that proposition. *See Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2024) (finding that the plaintiffs lacked standing because their claimed injury was based on "speculation" and was "[in]sufficiently concrete," not because the plaintiff violated the law); *Bell v. Am. Traffic Sols. Inc.*, 371 F. App'x 488, 490 (5th Cir. 2010) (holding no standing where plaintiffs received citations for running red lights, did not contest that they ran red lights, and instead argued that the unlicensed company that operated the traffic cameras that caught them was negligent per se); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 764 (9th Cir. 2018) (analyzing third-party standing and finding that the harm was not traceable to the challenged rule); *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc) (finding *plaintiffs had standing* but affirming dismissal of case on the merits where challenged constitutional provision imposing supermajority requirement for enactment of wildlife management initiatives did not implicate First Amendment based on core political speech and overbreadth theories).

---

U.S. Dist. LEXIS 123020 (E.D.N.C. June 27, 2025), subsequently rejected the Kentucky district court's conclusions. *See* 2025 U.S. Dist. LEXIS 123020 at *8-9.

*Second*, sellers and users of unauthorized ENDS are not analogous to drug smugglers or illegal drug users. Appellant's drug smuggler/drug user example does not apply where, as here, FDA is exercising its enforcement discretion. And, in any event, whether a product is "illegal" under the FDCA is not for the State of Iowa to decide. On this point, the district court correctly reasoned that "[a] rule that denies standing to Plaintiffs based solely on imperfect compliance with federal law would create an anomalous result; states could evade preemption challenges by simply asserting a plaintiff's noncompliance with the very federal standards at issue." Appellant's Add. at 13. "Such circularity finds no support in our federalist structure." *Id*.

*Third*, the retailer Appellees' injuries are not limited to lost revenues and profits from sales of unauthorized ENDS. Enforcement of H.F. 2677's vapor products directory would force the retailers to close their doors, causing them to suffer lost revenues and profits from sales of other products that they sell, including FDA-authorized ENDS eligible to be listed on the vapor products directory, FDA-authorized nicotine pouches, federally legal hemp products, and other products, such as premium cigars, alcoholic beverages, and apparel and accessories. *See* Appellant's Add. p. 14; R. Doc. 42 pp. 17-37. Such threatened indirect injuries are "fairly traceable" to H.F. 2677 and so establish Article III standing. *Carlsen*, 833

F.3d at 909-10; *Ben Oehrliens & Sons & Daughter, Inc. v. Hennepin County*, 115 F.3d 1372, 1379 (8th Cir. 1997).

*Fourth*, even if Appellant's standing argument were correct as to the retailer Appellees (which it is not), the argument would still be incorrect as to the consumer Appellees. Federal law prohibits mere possession of controlled substances, including marijuana. 21 U.S.C. § 844(a); 21 C.F.R. § 1308.11(d)(23). But the FDCA does not prohibit the mere possession (or use) of unauthorized ENDS; it prohibits only the distribution of unauthorized ENDS in interstate commerce. 21 U.S.C. § 331(a)-(c). So, the consumer Appellees have standing regardless of whether the retailer Appellees have standing. And "the presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

*Fifth*, as a practical matter, if H.F. 2677 were not enjoined and Appellees were subject to a penalty proceeding as a result, there is no doubt that they could raise federal preemption as a defense. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) ("Ordinarily federal pre-emption is raised as a defense . . . ."); *accord Anderson v. John Morrell & Co.*, 830 F.2d 872, 875 (8th Cir. 1987). It thus stands to reason that Appellees should have Article III standing to anticipatorily challenge the statute. *See Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014) (when

subject to a threat of enforcement, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law").

## II. The District Court Correctly Held that Appellees Have a Strong Likelihood of Success on the Merits Because House File 2677 is Impliedly Preempted by the FDCA.

The primary flaw in Appellant's merits argument is that Appellant fundamentally misunderstands the relationship between the relevant statutory provisions of the FDCA—21 U.S.C. §§ 337(a), 387j, and 387p—and Congress' intent in enacting them. The FDCA's implied preemption provision, 21 U.S.C. § 337(a), preempts H.F. 2677's attempt to step into the shoes of the FDA and indirectly enforce the premarket requirements that the FDCA imposes, through 21 U.S.C. § 387j, on tobacco products. Even though Appellant couches H.F. 2677 as a sales restriction that falls within 21 U.S.C. § 387p's savings clause, because H.F. 2677 explicitly incorporates by reference and compels full or partial compliance with section 387j's premarket review requirements, and because H.F. 2677 directly conflicts with the FDA's discretion to enforce section 387j, H.F. 2677 is preempted by section 337(a).

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing U.S. Const., art. VI, cl. 2). As relevant here, "state law is naturally preempted to the extent of any conflict with a federal statute." *Id.* at 372. This

"implied conflict preemption" occurs where, *inter alia*, "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Title 21 U.S.C. § 337(a) provides that "[e]xcept as provided in subsection (b), all such proceedings for the enforcement, or to restrain violations, of this [Act] shall be by and in the name of the United States." The Supreme Court has held that section 337(a) "commits complete discretion to [the FDA] to decide how and when [the FDCA's enforcement provisions] should be exercised." *Heckler*, 470 U.S. at 835; *accord Andrews v. Conrail*, 831 F.2d 678, 686-87 (7th Cir. 1987) (holding that the FDA "is invested with discretionary authority to pursue or deny instituting enforcement actions . . . as the [agency] may deem appropriate"). And the Supreme Court has held that section 337(a) impliedly preempts any claim that seeks to directly or indirectly enforce the Act. *Buckman*, 531 U.S. 341.

In *Buckman*, plaintiffs alleged they suffered personal injuries caused by defective FDA-cleared medical devices. The plaintiffs' claims included state-law fraud claims based on an allegation that the defendant had obtained FDA clearance of the devices by submitting false reports to the FDA.[7] The Court held that the

---

[7] The FDCA prohibits the submission of such false reports. *See* 21 U.S.C. § 331(q)(2); *see also* 21 U.S.C. § 360(k) (discussing required reports for devices).

plaintiffs' state-law claims "conflict[ed] with" and were "therefore impliedly preempted by" the FDCA. 531 U.S. at 348.

The Court noted that the "conflict stem[med] from the fact that the federal statutory scheme amply empowers the FDA to punish and deter fraud against the agency," that "this authority is used by the Administration to achieve a somewhat delicate balance of statutory objectives," and that such a balance could "be skewed by" the plaintiffs' claims. *Id*. In other words, the FDA "has at its disposal a variety of enforcement options," including "seeking injunctive relief and civil penalties, seizing the [products], and pursuing criminal prosecutions," that "allow the agency to make a measured response to suspected" violations of the FDCA. *Id*. at 349 (cleaned up). The FDA may also choose not to enforce certain violations of the FDCA.

The Court also explained why plaintiffs could not circumvent implied preemption by styling their claims as state-law claims. Unlike "traditional state tort law [claims] which had predated the federal enactments in question[]," plaintiffs' "claims exist[ed] solely by virtue of the FDCA." 531 U.S. at 353. In short, "the existence of [the FDCA]" was "a critical element in [plaintiffs'] case." *Id*. Finally, the Court concluded that for "the reasons stated above," plaintiffs' claims "would exert an extraneous pull on the scheme established by Congress, and [those claims were] therefore preempted by that scheme." 531 U.S. at 353.

Section 337(a) impliedly preempts a state law claim when that claim would not exist but for the existence of the FDCA. *See, e.g., Bryant v. Medtronic, Inc.*, 623 F.3d at 1205 (holding section 337(a) preempted state law claim that was based on manufacturer's failure to file reports with the FDA in accordance with FDA regulations); *Loreto v. Proctor & Gamble Co.*, 515 Fed. Appx. 576, 579 (6th Cir. 2013) ("The question, then, is how to determine whether a claim formally asserted under state law is in substance one seeking to enforce the FDCA. The Supreme Court supplied the test in *Buckman*: If the claim would not exist in the absence of the FDCA, it is impliedly preempted.").

The FDCA likewise impliedly preempts a state law claim asserted under a state statute that itself references the FDCA. *See, e.g., Nexus Pharms.*, 48 F.4th at 1046 (holding that when claims rely "on a state statute which itself relies on the federal statute," such claims stand as an obstacle to the FDA's enforcement discretion and are impliedly preempted); *Novo Nordisk Inc. v. Live Well Drugstore, LLC*, No. 23-cv-808, 2025 U.S. Dist. LEXIS 17792 (M.D. Fla. Jan. 30, 2025) (holding that section 337(a) impliedly preempted a Florida statute that prohibited the sale of drugs not approved by the FDA); *Regan v. Sioux Honey Ass'n Coop.*, 921 F. Supp. 2d 938, 944-45 (E.D. Wis. 2013) (holding claim that defendant violated Wis. Admin. Code § ATCP 90.10(1) was impliedly preempted because "a private party

cannot attempt to enforce the FDCA under the guise of state law claims" (cleaned up)).

And the Ninth Circuit has found section 337(a) to provide the basis for a seller of tobacco products to obtain a preliminary injunction against a state attorney general's enforcement action because "the claim exist[ed] solely by virtue of the FDCA." *Grand River Enters. Six Nations v. Knudsen*, No. 23-35494, 2024 WL 2992503 (9th Cir. Jun. 14, 2024) (cleaned up).

By explicitly cross-referencing and incorporating 21 U.S.C. § 387j and its premarket review procedures, H.F. 2677 falls outside the scope of the TCA's preservation and savings clauses found in 21 U.S.C. § 387p(a)(1) and (a)(2)(B). Enforcement of H.F. 2677 is not a statutorily permitted exercise of Iowa's preserved state police powers.

There are many types of restrictions that Iowa could conceivably enact under the preservation and savings clauses found in 21 U.S.C. § 387p(a)(1) and (a)(2)(B) that would not implicate section 337(a) and implied preemption because they would neither reference nor compel compliance with the FDCA, including flavor bans and nicotine strength limits. *See R.J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170 (8th Cir. 2023) (upholding ban on flavored tobacco products). In each case, the State's exercise of its police powers under the TCA's preservation and savings provisions would not conflict with section 337(a) of the FDCA. But because H.F.

2677 both references and compels at least partial compliance with the FDCA's premarket review requirements found in 21 U.S.C. § 387j, the state statute is preempted.

Fundamentally, Appellant's interpretation of the relationship between 21 U.S.C. § 387p and § 337(a) would nullify section 337(a) with respect to any State law requirement that could be couched as a "sales" restriction even if that requirement compelled compliance with one of the FDCA's tobacco provisions. The FDCA's text, structure, and legislative history demonstrate that such an outcome is inconsistent with Congress's intent.

### A. The text and structure of the FDCA, including the Act's tobacco provisions, reflect that Congress intended section 337(a) to apply to tobacco products.

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). In determining the intent of Congress, this Court may "properly consider a statute's subject matter, the object to be accomplished, the purpose to be served, the underlying policies, and the consequences of various interpretations." *United States v. R.L.C.*, 915 F.2d 320 (8th Cir. 1990); *see also Abramski v. United States*, 573 U.S. 169, 179 (2014) (noting that, in statutory interpretation, the Court "must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history and purpose" (internal citation and quotation marks omitted)); *Thunder Basin Coal*

*Co. v. Reich*, 510 U.S. 200, 207 (1994) (providing that Congress's intent "is determined from the statute's language, structure, and purpose, its legislative history").

Section 337(a) has been part of the FDCA since Congress enacted the Act in 1938. *See* 52 Stat. 1040, 1046 (1938). Section 337(a) is found in Chapter III of the FDCA (codified as subchapter III of chapter 9 of title 21 of the United States Code), which is titled "Prohibited Acts and Penalties." Other provisions in Chapter III prohibit the interstate distribution of any "food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded," 21 U.S.C. § 331(a), and provide mechanisms for the FDA to enforce that prohibition, 21 U.S.C. §§ 332-334. The FDCA's product-category-specific requirements, including the definitions of "adulterated" and "misbranded" as those terms are applied to categories of products, are located in Chapters IV, V, VI of the FDCA. *See*, *e.g.*, 52 Stat. at 1046 ("Chapter IV—Food"); 1049 ("Chapter V—Drugs and Devices"); *id*. at 1054 ("Chapter VI—Cosmetics"); *see also* 21 U.S.C. § 387b (adulteration provision for tobacco products).

As originally enacted in 1938, the FDCA did not include any savings or express preemption clauses. But because the FDCA's subsequently enacted savings and express preemption clauses are product-category-specific, Congress has typically placed them in the FDCA chapter dedicated to that product category. *See,*

*e.g.*, 21 U.S.C. § 346a(n)(8) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 350e(e) (preemption clause regarding food; located in Chapter IV); 21 U.S.C. § 350g(*l*)(6) (savings clause regarding food; located in Chapter IV); 21 U.S.C. § 360k(a) (preemption clause regarding medical devices; located in Chapter V); 21 U.S.C. § 364j (preemption and savings clauses regarding cosmetics; located in Chapter VI). Significantly, no court has ever held that any of the FDCA's savings or express preemption clauses for food, drugs, medical devices, or cosmetics limits the scope of section 337(a)'s prohibition on parties other than the federal government enforcing the FDCA.

Indeed, Congress has recognized that because of the FDCA's structure, any statutory limitation on the scope of section 337 must come through an amendment to section 337, not through an amendment to provisions in one of the product-category-specific chapters of the FDCA. In 1990, Congress amended the FDCA through the Nutrition Labeling and Education Act ("NLEA"). Pub. L. 101-535, 104 Stat. 2353 (1990). The NLEA expanded the FDA's authority over food labeling by revising various provisions within Chapter IV of the Act, but simultaneously enacted a new subsection (b) of section 337 that allows States to bring proceedings to enforce and restrain violations of certain food-related provisions of the FDCA. *See* 104 Stat. at 2362 (creating 21 U.S.C. § 337(b)).

Congress's decision to limit the scope of section 337(a) by amending section 337 makes sense. After all, people reading section 337 should not be expected to read every other provision of the FDCA, including provisions in other chapters of the FDCA, to find out whether Congress has limited the scope of section 337(a). Unlike with food products, Congress has never enacted a new subsection of section 337 that exempts tobacco products from the operation of section 337(a).

Consideration of other preemption provisions found in the FDCA reinforces the conclusion that Congress intended section 337(a) to apply to tobacco product requirements. In describing state requirements that are expressly preempted in several other provisions, Congress repeatedly used the formulation ". . . different from, in addition to, or *otherwise not identical to* . . ." the FDCA's requirements. *See* 21 U.S.C. §§ 364j(a), 379aa(h)(1), 379aa-1(h)(1), and 379s(a) (emphasis added). However, the TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A), does not include the term "otherwise not identical to." Congress's omission of that language reflects Congress's intent to impliedly preempt under section 337(a) state law requirements that compel compliance with the TCA's requirements because they incorporate the TCA's requirements by reference.

**B.** **When it enacted the TCA, Congress understood from *Buckman* and its progeny that section 337(a) could impliedly preempt state law duties if the "existence of" the TCA was a "critical element" of those duties.**

Courts must "assume that Congress is aware of existing [case] law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-97 (1979)). So, courts must assume that Congress was aware of case law interpreting the FDCA—including *Buckman* and its progeny—when it passed the TCA in 2009.

As noted above, in *Buckman*, the Court held that section 337(a) impliedly preempted the plaintiffs' state law claims because "the existence of [the FDCA] was a critical element" of the defendant's purported state law duties. 531 U.S. at 353. The Court reasoned that such "claims inevitably conflict with the FDA's responsibility" to enforce the FDCA "consistently with the [Agency's] judgment and objectives." *Id.* at 350; *accord Nathan Kimmel v. DowElanco*, 275 F.3d 1199, 1206 (9th Cir. 2002) (stating that the "key factor identified by the Supreme Court in concluding that Buckman's claims were pre-empted was that 'the existence of [the FDCA was] a critical element in [the] case'"). Therefore, when Congress passed the TCA in 2009, it knew that section 337(a) could impliedly preempt any state law if the existence of the TCA was a critical element of a person's duties under that state law. Had Congress wanted to avoid implied preemption of state law duties or claims that depend on the existence of the TCA, it would have amended section 337.

And *Buckman* is applicable to the TCA notwithstanding the TCA's preservation, express preemption, and savings clauses. The *Buckman* plaintiffs argued that there should be no finding of implied conflict preemption under section 337(a) because the FDCA included an express preemption provision for medical devices. *Buckman*, 531 U.S. at 863. That express preemption provision preempts any State law requirement "(1) which is different from, or in addition to, any requirement applicable under [the FDCA] to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under [the FDCA]." But the Court rejected the plaintiffs' argument because "neither an express preemption provision nor a savings clause 'bars the ordinary working of conflict pre-emption principles.'" *Buckman*, 531 U.S. at 352 (quoting *Geier*, 529 U.S. at 869).

**C.    In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).**

The text, legislative history of the TCA, and the practical effect of section 387p's preservation and savings clauses all support the conclusion that Congress did not intend those clauses to insulate state sales restrictions that compel compliance with other provisions of the TCA from implied preemption under section 337(a).

### 1. The plain language of section 387p suggests that Congress did not intend it to limit the applicability of section 337(a).

As codified in the United States Code, section 387p(a)(1) states: "Except as provided in paragraph (2)(A), nothing in this subchapter, or rules promulgated under this subchapter, shall be construed to limit the authority of . . . a State . . . ."[8] The "subchapter" referenced in subsection (a)(1) is subchapter IX of the FDCA, the TCA's provisions relating to the FDA's regulation of tobacco products. However, as noted above, as codified, section 337(a) is found in subchapter III of the FDCA. If Congress had intended section 387p to limit the implied preemptive effect of section 337(a), it would not have referenced only the subchapter referencing the FDCA's tobacco provisions, but rather "Food, Drug, and Cosmetic Act" or "Act" to refer to the entirety of the FDCA or some other language to explicitly encompass section 337(a) in subchapter III. *See*, *e.g.*, 21 U.S.C. § 346a ("***Nothing in this Act*** preempts the authority of any State or political subdivision to require that a food containing a pesticide chemical residue . . . .") (emphasis added); 21 U.S.C. § 387a-1(a)(1)(A) (providing for the issuance of a final rule "under . . . the Federal Food, Drug, and Cosmetic Act"). The fact that Congress did not do so reflects Congress's

---

[8] As originally enacted, the TCA used the term "chapter" instead of "subchapter." *See* Pub. L. 111-31, 123 Stat. at 1823. However, "chapter" as used there clearly referenced what was ultimately codified in the United States Code as subchapter IX of Chapter 9 of Title 21. *See* 123 Stat. at 1784 (referencing "Chapter IX—Tobacco Products").

intent for section 337(a) to apply equally to the TCA's requirements as to any other provision of the FDCA.

This conclusion is reinforced by cases addressing an express preemption provision similar to that found in section 387p. The TCA's express preemption provision, 21 U.S.C. § 387p(a)(2)(A), is modeled on the FDCA's express preemption provision for medical devices. *See* 21 U.S.C. § 360(k) (preempting any State or local requirement "which is different from, or in addition to, any requirement applicable under this Act to the device"). And federal "courts have generally agreed that" a state law claim survives preemption under section 360k only if it "is premised on conduct that both (1) violates the FDCA, and (2) ***would give rise to recovery under state law even in the absence of the FDCA.***" *Scanlon v. Medtronic Sofamor Danek USA, Inc.*, 61 F. Supp. 3d 403, 411 (D. Del. 2014) (collecting cases) (emphasis added). H.F. 2677's directory restrictions do not meet that test because they explicitly cross-reference 21 U.S.C. § 387j; they could not provide for either a legal duty by a seller of ENDS products or an action against that seller in the absence of the FDCA.

> **2.    The TCA's legislative history suggests Congress did not intend section 387p's preservation and saving clauses to nullify section 337(a) with respect to tobacco products.**

When Congress was considering the TCA, members of Congress introduced an amendment that would have created a separate statutory scheme outside of the

FDCA (including an agency outside of the FDA) to regulate tobacco products. *See* H.R. Rep. No. 111-58, pt. 1, at 6 (Mar. 2009). That separate statutory scheme—the Youth Prevention and Tobacco Harm Reduction Act (the "THR Act")—included a provision substantively identical to 21 U.S.C. § 337(a) and a preservation clause identical to the one in the TCA. *See* H.R. 1261, THR Act § 104 ("All proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States."), THR Act § 119 ("Preservation of State and Local Authority") (Mar. 3, 2009).

The authors of the THR Act understood that their proposed legislation's preservation clause (section 119) did not nullify their proposed legislation's section 337(a)-like provision (section 104). That understanding makes sense because one provision of an act cannot be read as implicitly nullifying another provision of that same act. *See*, *e.g.*, *South Carolina v. Catawba Indian Tribe*, 476 U.S. 498, 510 n.22 (1986) ("It is an elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.") (internal quotation and citation omitted); *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute, . . . rather than to emasculate an entire section.") (internal quotations and citation omitted).

So, it stands to reason that Congress did not intend the TCA's preservation and savings clauses—21 U.S.C. § 387p(a)(1) and (a)(2)(B)—to implicitly exclude

state tobacco product regulations from the scope of section 337(a). Rather, Congress intended section 337(a) to impliedly preempt statutes enacted pursuant to a State's preserved powers if they generate a conflict with the FDA's balancing of competing Congressional objectives in enacting the TCA.

3. **Appellant's interpretation of section 387p would allow a State to deputize itself to enforce any of the FDCA's tobacco provisions and render the express preemption provision of section 387p(a)(2)(A) a nullity.**

As a practical matter, Appellant's interpretation would also impose no restrictions on a State's ability to deputize itself to enforce any of the FDCA's tobacco provisions so long as its actions influence sales, thereby rendering the express preemption provision of section 387p(a)(2)(A) a nullity.

For example, the FDCA requires tobacco product manufacturing facilities to register with the FDA, *see* 21 U.S.C. § 387e(b); and it authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a tobacco product manufactured in a non-FDA-registered facility.[9] But under Appellant's reading of section 387p, a state could enforce the

---

[9] The FDCA deems any tobacco product to be "misbranded" if it was manufactured in a non-FDA-registered facility, *see* 21 U.S.C. § 387c(a)(6); the FDCA prohibits the sale of any "misbranded" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "misbranded" tobacco products, *see* 21 U.S.C. §§ 332-334; and the FDCA says that "all such proceedings" must be brought "in the name of the United States," *see* 21 U.S.C. § 337(a).

section 387e(b) registration requirement through a "sales restriction" that prohibits the sale of tobacco products manufactured in non-FDA-registered facilities. As another example, the FDCA requires the manufacturer or importer of certain tobacco products to pay a quarterly "user fee" to the FDA, *see* 21 U.S.C. § 387s; and it authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells a tobacco product manufactured or imported by someone who has not paid the required user fee.[10] But under Appellant's interpretation of section 387p, a State could enforce the section 387s user fee requirement through a "sales restriction" that prohibits the sale of tobacco products manufactured or imported by a person who did not pay the required user fee.

The situations discussed in the previous paragraph are no different from the situation here. The FDCA requires the manufacturer of any "new" tobacco product—including an ENDS product—to obtain FDA marketing authorization through the premarket tobacco product application process under 21 U.S.C. § 387j. Through section 337(a), the FDCA also authorizes the federal government, and only the federal government, to bring enforcement proceedings against anyone who sells

_____

[10] The FDCA deems any tobacco product to be "adulterated" if it was manufactured or imported by someone who has not paid the required user fee," *see* 21 U.S.C. § 387b(4); the FDCA prohibits the sale of any "adulterated" tobacco product, *see* 21 U.S.C. § 331(a); the FDCA authorizes civil and criminal enforcement proceedings for the sale of "adulterated" tobacco products, *see* 21 U.S.C. §§ 332-334.

a new tobacco product that does not have FDA marketing authorization.[11] But under the State's reading of section 387p, a State could enforce the section 387j premarket authorization requirement through a "sales restriction" that prohibits the sale of tobacco products that require, but lack, FDA marketing authorization or a pending application for the same.

In short, under Appellant's interpretation, there would be no limitations on what TCA requirements states could indirectly enforce as "sales" restrictions or requirements. And, because states could enforce any TCA requirement under the guise of a sales restriction or requirement,[12] the express preemption provision of Section 387p(a)(2)(A) that prohibits state requirements "different from, or in addition to, any requirement under [the TCA] relating to tobacco products standards, premarket review, adulteration, misbranding, labeling, registration, good manufacturing standards, or modified risk tobacco products" would be rendered a nullity. Such an interpretation is to be avoided. *See, e.g.*, *United States v. Belmont*, 831 F.3d 1098, 1101-02 (8th Cir. 2016) ("It is 'a cardinal principle of statutory

---

[11] The FDCA deems any tobacco product to be "adulterated" if the product requires, but lacks, FDA premarket authorization, *see* 21 U.S.C. § 387b(6). *See also supra* n.10.

[12] Appellant's claim in pages 26-27 of her Brief that FDA's "case-by-case" enforcement approach is a function of the FDA's lack of resources constitutes an inadvertent omission that H.F. 2677 is not a mere sales restriction, but in actuality an attempt by the Iowa legislature to fill what it perceives to be an FDA resource gap.

construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'") (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)); *Westerfeld v. Indep. Processing, LLC*, 621 F.3d 819, 824 (8th Cir. 2010) ("Our task, therefore, is to avoid interpreting a statute in a manner that renders any section of the statute superfluous or fails to give effect to all of the words used by Congress.").

Appellant's interpretation of the scope of permissible state sales restrictions under 21 U.S.C. § 387p is overbroad and cannot include requirements that are duplicative of those found in the FDCA. In enacting the TCA, Congress did not intend section 387p's preservation and savings clauses to insulate state "sales" restrictions that compel compliance with other provisions of the TCA from implied preemption under 21 U.S.C. § 337(a).

**D.    The State's interpretation of the FDCA would tolerate state law requirements that actually conflict with federal requirements, violating the Supreme Court's command that preservation and savings clauses do not bar the ordinary working of conflict preemption principles.**

H.F. 2677 creates a genuine conflict with the FDA's exclusive enforcement authority under 21 U.S.C § 337(a), and the discretion with which Congress entrusted the FDA to enforce 21 U.S.C. 387j. Yet Appellant's interpretation of the FDCA would suggest that Congress intended 21 U.S.C. § 387p's preservation and savings clauses to impede basic principles of conflict preemption even where actual conflict

between the state and federal government's approaches exists. This is an illogical conclusion, and this Court should not accept it. *See*, *e.g.*, *Marcin Lumber & Cedar Co. v. PPG Indus.*, 401 F.3d 901, 923 (8th Cir. 2005) (noting that courts should "interpret statutes in a way that avoids constitutional problems") (internal quotation omitted); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available.").

"The ordinary principles of preemption include the well-settled proposition that a state law is preempted where it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 406 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (2002)). And as the Supreme Court has repeatedly declared, a savings clause "does *not* bar the ordinary working of conflict pre-emption principles." *Geier*, 529 U.S. at 869; *cf.* 73 Fed. Reg. 49603, 49605 (Aug. 22, 2008) ("FDA does not believe that the absence of an express preemption provision with respect to drugs affects the application of the doctrine of implied preemption."). When state law permits "actions that 'actually' conflict' with federal regulations, it would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary preemption principles, seeks to protect." *Geier*, 529 U.S. at 872. "To the extent that

such an interpretation of the savings provision reads into a particular federal law toleration of a conflict that those principles would otherwise forbid, it permits that law to defeat its own objectives, or potentially, as the [Supreme] Court has put it before, to 'destroy itself.'" *Id.* (quoting *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 228 (1998)).

When Congress enacted the TCA, it charged the FDA with reducing serious tobacco-related disease and death, which is primarily caused by traditional, combustible cigarettes. *See* TCA, § 3(9), 123 Stat. at 1782 (stating that one of the purposes of the TCA is "to promote cessation to reduce disease risk and the social costs associated with tobacco-related diseases"). One of the ways Congress identified to reduce such disease and death was to give the FDA "new and *flexible* enforcement authority" over "less harmful tobacco products." TCA, § 3(4), 123 Stat. at 1782 (emphasis added).

Since ENDS became subject to the FDA's regulatory authority in 2016, the FDA has continually communicated to the ENDS industry its policy of discretionary enforcement. This is because the FDA has recognized that removing most or all ENDS products from the market would have negative health outcomes. In the FDA's own words, "[t]hrough enforcement [discretion] policies that FDA has revised over time, the agency has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers

completely transition from or significantly reduce smoking combustible cigarettes."[13] App. 19 ¶ 57; R. Doc. 27 p. 15.

Congress entrusted the FDA with exclusive enforcement discretion to strike a balance between the risks and benefits to public health of allowing unauthorized ENDS products to remain on the market when few FDA-authorized ENDS have been available. By indirectly enforcing 21 U.S.C. § 387j, H.F. 2677 directly conflicts with the FDA's considered and communicated approach of enforcement discretion and is therefore preempted. *See Nexus Pharms.*, 48 F.4th at 1048 ("If state law facilitates enforcement beyond what the FDA has deemed appropriate, then state law claims may indeed 'stand as an obstacle' to FDA's enforcement discretion."); *Farina v. Nokia, Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("The Supreme Court's preemption case law indicates that regulatory situations in which an agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption."); *cf. Sprietsma v. Mercury Marine*, 537 U.S. 51, 66-67 (2002) (noting that "a federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in

---

[13] Appellant's argument that this Court should give no weight to the FDA's enforcement policy because the header on the FDA's 2020 guidance includes the disclaimer "Contains Nonbinding Recommendations" is a red herring. Appellant's Br. at 26. This disclaimer is directed at the FDA, not states attempting to interfere with the FDA's enforcement discretion.

that event would have as much pre-emptive force as a decision *to* regulate.")
(emphasis in original).

To read 21 U.S.C. § 387p to tolerate the conflict that H.F. 2677 creates with the FDA's enforcement discretion approach when it comes to 21 U.S.C. § 387j would permit the FDCA to defeat its own objectives. It is antithetical to the principle of federal preemption that the existence of a savings provision would require the toleration of this conflict. *See Geier*, 529 U.S. at 871 ("Why . . . would Congress not have wanted ordinary pre-emption principles to apply where an actual conflict with a federal objective is at stake?"). For this fundamental reason, "[t]he [Supreme] Court has thus refused to read general 'saving' provisions to tolerate actual conflict . . . in "frustration-of-purpose" cases[.]" *Id*. at 873-74.

Both this Court and the Supreme Court have held that state laws that conflict with or create an obstacle to a federal agency's enforcement discretion are preempted. *See e.g.*, *United States v. Iowa*, 126 F.4th 1334, 1347 (8th Cir. 2025) ("Even accepting Iowa's interpretation, Section 2 is still an obstacle to the exercise of the discretion that Congress gives to federal officials charged with enforcing federal immigration law.") (collecting cases), *underlying decision later vacated under Munsingwear*, No. 24-2265, 2025 WL 1140834 (8th Cir. Apr. 15, 2025); *Arizona*, 567 U.S. at 406 ("Although § 5(C) attempts to achieve one of the same goals as federal law—the deterrence of unlawful employment—it involves a conflict

in the method of enforcement. The [Supreme] Court has recognized that a '[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy.'") (quoting *Motor Coach Employees* v. *Lockridge*, 403 U.S. 274, 287, 91 S. Ct. 1909, 29 L. Ed. 2d 473 (1971)).

H.F. 2677 conflicts with the FDA's method of enforcement of the FDCA by deputizing the IDOR to indirectly enforce 21 U.S.C. § 387j against sellers of ENDS products that lack premarket authorization through increasing civil money penalties, license revocation, and misdemeanor offense charges. H.F. 2677 §§ 6-1 to 6-5. Further, H.F. 2677 creates the possibility of additional prosecution under Iowa's consumer fraud statute *Id*. ("Knowingly shipping or receiving vapor products in violation of this subchapter is an unfair practice and a violation of [Iowa Code] section 714.16."). This goes far beyond the FDA's historical approach when it has determined that an ENDS product lacking marketing authorization should be removed from the market, which is to issue Warning Letters to "give individuals and firms an opportunity to take voluntary and prompt corrective action before [the FDA] initiates an enforcement action." *See* Food and Drug Administration Regulatory Procedures Manual, July 2024, Ch. 4 Advisory Actions, § 4-1-1, *available at* https://www.fda.gov/media/71878/download.

Congress tasked the FDA with reducing disease and death caused by traditional tobacco products, and in so doing, the FDA made the "deliberate choice"

to leave many unauthorized ENDS products on the market by deferring enforcement of 21 U.S.C. § 387j. *Arizona*, 567 U.S. at 405. The IDOR's indirect enforcement of 21 U.S.C. § 387j through H.F. 2677 is "inconsistent with federal policy and objectives." *Id*. The Supreme Court "has repeatedly 'declined to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.'" *Geier*, 529 U.S. at 870 (quoting *United States v. Locke*, 529 U.S. 89, 106 (2000)). So, too, should this Court decline to read 21 U.S.C. § 387p to tolerate this conflict.

**E.  Even examining section 387p in isolation, H.F. 2677 would be expressly preempted because it imposes premarket authorization requirements that are "different from" or "in addition to" those set forth in 21 U.S.C. §§ 387j and 387e(i).**

Even if one were to ignore section 337(a) and implied preemption in their entirety, the TCA's express preemption clause, section 387p(a)(2)(A), would still preempt H.F. 2677. This is the case because H.F. 2677 contains premarket review, adulteration, and registration requirements that are "different from" or "in addition to" those imposed by the TCA and, as explained above, adopting the State's overbroad interpretation of section 387p's savings clause would otherwise render section 387p(a)(2)(A)'s limitations on State authority a nullity.

Title 21 U.S.C. § 387j and 21 C.F.R. §§ 1114.1-1114.49 govern the FDA's premarket review process for ENDS products. As discussed above, under the FDCA, ENDS products that lack a marketing granted order are considered "adulterated"

under 21 U.S.C. § 387b(6)(A) and their sale in interstate commerce is prohibited under 21 U.S.C. § 331(a)-(c). Moreover, manufacturers of tobacco products have an independent statutory obligation to register all tobacco products that they are manufacturing for commercial distribution under 21 U.S.C. § 387e(i). Failure to properly register a tobacco product similarly renders that product "adulterated" and prohibits its sale in interstate commerce. *See* 21 U.S.C. § 331(p).

H.F. 2677 imposes specific requirements related to premarket review, adulteration, and registration that are not found in these provisions of the TCA or the FDA's associated regulations. For example, to be registered in IDOR's directory, in addition to submitting a PMTA to FDA, a manufacturer must pay an initial fee of $100 per product, along with an annual renewal fee of $100 per product. H.F. 2677 § 4-3. Neither the FDCA nor the FDA requires payment of any such fee to register an ENDS product with the FDA, nor to submit a PMTA or obtain a marketing granted order from the FDA, let alone an annual fee.

For each of these reasons, the text, structure, purpose, and legislative history of the FDCA and TCA require the conclusion that H.F. 2677 is preempted. Appellees are likely to succeed on the merits of their preemption claim.

## III. The District Court Adequately Addressed the Non-Merits Factors for a Preliminary Injunction.

Contrary to Appellant's claim, the district court also adequately addressed the remaining preliminary injunction factors beyond Appellees' likelihood of success on the merits.

Appellant's claim that the district court did not make any findings on Appellees' likelihood of suffering irreparable harm is simply wrong. The district court held:

> Plaintiffs have demonstrated concrete injuries that readily satisfy the injury-in-fact requirement. The manufacturer and retailer Plaintiffs face substantial economic harm—including lost sales, customers, and goodwill—if House File 2677 takes effect. Such economic injuries represent paradigmatic examples of concrete harm sufficient to support standing. *United States v. Texas*, 599 U.S. 670, 676 (2023). The individual consumer Plaintiffs face imminent loss of access to products they rely upon to avoid combustible cigarettes, presenting direct health risks. These injuries are not speculative, but flow directly from House File 2677's enforcement.
>
> The economic impact on the retailer Plaintiffs is particularly concrete and immediate. They attest that the law's enforcement would require them to close their businesses entirely, causing lost revenues not only from unauthorized ENDS products but also from numerous other product lines, including FDA-authorized ENDS products, FDA-authorized nicotine pouch products, federally legal hemp products, and other non-ENDS merchandise. This broader economic impact demonstrates the concrete nature of Plaintiffs' injuries regardless of whether certain products in their inventory lack FDA authorization.

Appellant Add. pp. 13-14.

Appellant does not clearly explain why it believes that the district court did not address the irreparable harm factor, but it seems to premise that contention on two bases: (1) the same erroneous arguments Appellant makes challenging Appellees' Article III standing; and (2) "[n]o Plaintiff alleges that they wish to sell or use any FDA-authorized vapes." Appellant Br. p. 65. For the same reasons explained above, whether the ENDS that Appellees sell and buy are "illegal" according to the State of Iowa is not the proper test for determining either standing or irreparable harm. Further, as explained above, and as the district court recognized, Plaintiffs submitted declarations explaining that they sell FDA-authorized ENDS, FDA-authorized nicotine pouches, and traditional tobacco products, and that they will lose the ability to sell *all* those products if H.F. 2677 is enforced because the loss of revenue from their sales of unauthorized ENDS will force them to shut their doors. *See* Appellant's Add. p. 14; Appellees' Add. pp. 1-2, 4-5, 7-9.

Nor is it the case that the district court failed to weigh the equities or whether a preliminary injunction would be in the public interest. When the government is a defendant—as here—the balance of equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court found that "Plaintiffs have demonstrated a strong likelihood of success on their constitutional claims and Defendants have identified no concrete, non-speculative damages they would suffer if wrongfully enjoined." Appellant's Add. p. 31. Through this factual finding, which

this Court must review for "clear error," the district court concluded that Appellant had failed to adduce evidence of harm if wrongfully enjoined and, thus, that the "merged" balance of harms and public interest factors favored issuing the injunction.

There is no dispute that the district court considered Appellees' likelihood of success on the merits. And, as the above-quoted text reflects, the district court weighed Appellees' risk of irreparable harm, the balance of harms, and the public interest. Having considered each of the factors, the district court committed no abuse of discretion in issuing the preliminary injunction.[14] *See Akerman v. Nw. Mut. Life Ins. Co.,* No. 24-3076, 2025 U.S. App. LEXIS 12093, *3 (7th Cir. May 19, 2025) (observing that "[a] likelihood of success and irreparable harm are threshold factors, which, if not satisfied, doom a plaintiff's request for injunctive relief" and finding no abuse of discretion where balance of equities not addressed); *Flight Options, LLC v. Int'l Bhd. Of Teamsters, Local 1108*, 863 F.3d 529, 544 (6th Cir. 2017); ("Weighing the preliminary-injunction factors is a matter of discretion, however, and here the

---

[14] While the district court undoubtedly provided more written analysis of the first two factors—likelihood of success on the merits and irreparable harm—such treatment is expected because they are the most crucial. *See Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) ("The likelihood of success on the merits is '[t]he most important of the [preliminary injunction] factors.'") (quoting *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998)); *Circle R. v. Smithco Mfg.*, 919 F. Supp. 1272, 1288 (N.D. Iowa 1996) ("Although [courts] generally look[] at all four factors in [their] preliminary injunction inquiry, central to the movant's burden are the likelihood of success and irreparable harm factors.") (cleaned-up).

district court did not abuse its discretion by not conducting an explicit four-factor analysis."); *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) ("[T]he four considerations applicable to preliminary injunction decisions are factors to be balanced, not prerequisites that must be met.").[15]

## IV. The District Court Acted Well Within Its Discretion in Waiving the Bond Requirement.

The district court also properly exercised its discretion in waiving the bond requirement. Federal Rule of Civil Procedure 65(c) provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." However, the amount of security is a matter for the district court's discretion, and a court may elect to waive the bond requirement. *See Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engr's*, 826 F.3d 1030, 1043 (8th Cir. 2016) (recognizing that district courts possess substantial discretion in making a bond determination and noting that a bond has not been required where, *inter alia*, "damages resulting from a wrongful issuance of an injunction have not been shown"); *Stockslager v. Carroll Elec. Coop. Corp.*, 528

---

[15] If a reviewing court finds that the lower court failed to adequately consider all required factors, the remedy is not reversal. Rather, "[t]he more common approach is to remand for the district court to conduct the full analysis in the first instance." *Home Instead, Inc. v. Florence*, 721 F.3d 494, 500 (8th Cir. 2013). Remand is not necessary here, however, because, as discussed, a review of the district court's order shows that the court considered all relevant factors.

F.2d 949, 951 (8th Cir. 1976) ("[The] amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion.").

Courts in this circuit have elected to require no security where "requiring a bond to issue before enjoining potentially unconstitutional conduct by a government entity simply seems inappropriate, because the rights potentially impinged by the government entity's actions are of such gravity that protection of those rights should not be contingent upon ability to pay," *Doctor John's, Inc. v. City of Sioux City.*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa 2004), where "there is no evidence that a party will suffer damages from the injunction," *Provell v. 1703408 Ontario Inc. Ltd.*, No. 3:10-cv-13, 2010 U.S. Dist. LEXIS 36290, *5 (D.N.D. March 15, 2010), or "[i]f the public interest favors it," *Council on American-Islamic Relations-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 371, 380 (D. Minn. 2020).

Here, there is no danger that Appellant will incur any damages from being preliminarily enjoined against enforcing an unconstitutional statute.[16] In the event that the preliminary injunction were ultimately found to have been wrongfully issued, the proper inquiry for purposes of setting a bond would not be the amount of

---

[16] Indeed, Appellant voluntary agreed to delay implementation of H.F. 2677 pending a ruling on the motion for preliminary injunction, indicating Appellant's own recognition that the State would not suffer damages if enforcement were preliminarily enjoined.

fines that the State could assess against the Appellees' businesses, as such an inquiry would conflate the potential amount of regulatory penalties the State could recover for violations with the relevant question—the damages Appellant would suffer from a wrongfully issued injunction. As the district court explained, this approach would be "particularly inappropriate" where Appellees "would face business closure rather than continued operation in violation of the statute." Appellant's Add. p. 31. The district court acted well within its discretion when it waived the bond requirement because "Plaintiffs have demonstrated a strong likelihood of success on their constitutional claims and Defendants have identified no concrete, non-speculative damages they would suffer if wrongfully enjoined." *Id*. Accordingly, this Court should not disturb the district court's ruling.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's preliminary injunction.

Date: August 27, 2025               Respectfully submitted,

                                    THOMPSON HINE LLP

                                    By: /s/ Eric N. Heyer
                                       Eric N. Heyer
                                       James C. Fraser
                                       Anna Stressenger
                                       1919 M Street, NW, Suite 700
                                       Washington, DC 20036
                                       Phone: 202.331.8800

Fax: 202.331.8330
Eric.Heyer@ThompsonHine.com
James.Fraser@ThompsonHine.com
Anna.Stressenger@ThompsonHine.com

*Counsel for Plaintiffs-Appellees*

## CERTIFICATE AS TO VIRUS SCANNING

Pursuant to Local Rule 28A(h), I hereby certify that this Corrected Plaintiffs-Appellees' Brief has been scanned for viruses and that the brief is virus-free.

/s/ Eric N. Heyer
Eric N. Heyer

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2025, I caused a true and correct copy of the foregoing Corrected Plaintiffs-Appellees' Brief to be filed with the Clerk's Office of the United States Court of Appeals for the Eighth Circuit using the CM/ECF system and to thereby be served via electronic mail on all counsel of record.


       /s/ Eric N. Heyer

           Eric N. Heyer

# CERTIFICATE OF COMPLIANCE

I hereby certify that Corrected Plaintiffs-Appellees' Brief complies with the type-volume requirement set forth in Federal Rule of Appellate Procedure 32. The word count feature found in Microsoft Word reports that the Brief contains 12,941 words, excluding the items exempted under Fed. R. App. P. 32(f).

The Corrected Plaintiffs-Appellees' Brief complies with the typeface and typestyle requirements of Federal Rule of Appellate Procedure 32 because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, size 14 font.

　　　　　　　　　　　　/s/ Eric N. Heyer
　　　　　　　　　　　　Eric N. Heyer